[Crim. No. 406.   Department Two.—September 26, 1898.]

THE PEOPLE, Respondent, v. JOHN F. MILNER, Appellant.

CRIMINAL LAW—MANSLAUGHTER—SELF-DEFENSE—SUPPORT OF VER-
DICT — PRESUMPTION — BURDEN OF PROOF.—The evidence re-
viewed, and held to indicate a case of self-defense, without sub-
stantial conflict, and to be insufficient to support a verdict of
manslaughter, were it not for the presumption of guilt arising
from proof of the homicide, which presumption authorized the
jury to determine the sufficiency of the evidence for the defend-
ant to overcome that presumption, under the burden of proof
devolving upon him, and prevents the setting aside of the ver-
dict for the lack of legally sufficient evidence to support it.

ID.—DIRECTION OF GUNSHOT WOUND—POSITION OF PARTIES—EXPERT
EVIDENCE.—The question whether the direction of a gunshot
wound in the body of the deceased indicated the position of
the person firing the shot above or below the person receiving
it, is not matter of expert or opinion evidence; and it is error
to allow a physician to testify to his opinion upon that question.

ID.—VIEW OF PREMISES BY JURY—WITNESS NAMING LOCALITIES—
EVIDENCE OUT OF COURT.—Upon a view of the scene of the
homicide by the jury, it is not an erroneous receiving of evidence
out of court to permit a witness, who has testified as fully as
possible in court, to point out and name to the jury the various
localities referred to in his testimony, and described in the
order of view.

ID.—PLACES POINTED OUT BY DEFENDANT TO CORONER'S JURY.—The
view may extend to places in which any material fact occurred;
and the court may order places to be pointed out to the trial
jury which were discovered by the coroner's jury, or pointed
out to them by the defendant, as described in the testimony
of the witness indicating them to the trial jury.

APPEAL from a judgment of the Superior Court of Riverside
County, and from an order denying a new trial.   J. S. Noyes,
Judge.

The facts are stated in the opinion of the court.

Thomas Fitch and John G. North, for Appellant.

W. F. Fitzgerald, Attorney General, and C. N. Post, Deputy
Attorney General, for Respondent.

HENSHAW, J.—Defendant, tried for the murder of S. J.
Darrah, was convicted of manslaughter.   He appeals from the
judgment and from the order denying him a new trial.

The facts are presented without conflict upon any material proposition, and under them defendant's counsel strenuously insist that the verdict is against the evidence.

Milner and Darrah were neighbors, living in Snow Creek canyon. Darrah's was the lower ranch, and to reach his land Milner was obliged to pass through the land of Darrah. Milner had sold to Darrah this land, reserving in the deed a right of way across it, and reserving also from his water rights in Snow creek thirty inches for his own use. This water he was diverting, and had been for some years, by means of a flume and ditch, taking the water from Snow creek a short distance above his house. There is some slight evidence, but evidence of little consequence, of pre-existing trouble between the two men. A witness testifies that about two years before he had heard the defendant say "that he had beat Darrah out of ten thousand dollars, and that he would beat the damned son of a bitch out of ten thousand dollars more before he got through." The use of this language, however, defendant denies. There is no evidence saving this of any antecedent difficulty, and there is positive evidence that the business transaction between Darrah and Milner was the sale by Milner to Darrah of his ranch for the sum of eight hundred and thirty-nine dollars.

Some little time before the tragedy other parties, with whom Milner was in no way connected, took preliminary steps to appropriate water from Snow creek. After having done so, they secured a bond or option for the purchase of Milner's land and water right. Darrah seems to have conceived the notion that an attempt was about to be made to deprive him of the water rights which he claimed, and that Milner was aiding in the effort. A surveying party attempted to cross the land of Darrah by Milner's right of way and was stopped by Darrah, armed with a rifle, and turned back, Darrah threatening to kill any of them that came upon his land. Darrah then threatened Milner's life, denied to Milner a right of way, and ordered him off of his land. Darrah's violent language and threats against the life of Milner are abundantly proven. Milner by all of the evidence seems to have maintained a pacific demeanor, and according to the testimony of one witness said that he dreaded having trouble with Darrah, because it could end in only one way, Darrah being excitable, and he,

Milner, always maintaining his coolness and temper, for which reason he, Milner, in the event of a deadly collision, would have a decided advantage. Milner, it appears, repeatedly told Darrah that they would settle their differences at law, and Darrah as repeatedly answered that he did not have to, or did not, or would not, settle his troubles that way. Milner went to town and procured the arrest of Darrah for disturbing his peace. That case was untried at the time of the tragedy. Again he went before the justice of the peace and swore to a complaint seeking to have Darrah put under bonds to keep the peace. Darrah with his lawyer came before the justice. The testimony of that officer is as follows: "We then asked Darrah—I believe I put the question to Darrah myself—that Milner had said to me he wanted to go to La Cueva ranch, the Snow creek ranch, that evening with his family, and that he was afraid that Darrah would injure him in crossing that land. He wanted to go that night. I then asked Darrah if he would have any objections to Milner crossing that land for that purpose. At first Darrah did not consent. He seemed to hesitate about giving his consent, but by Mr. Purington (his lawyer) talking to him, as well as myself, he finally consented to allow Milner to cross the road without molestation from himself, excluding the power company from the permission, and I believe he named Barker. Milner objected to that kind of permission, said his brother might want to call and see him, and that permission would bar him from coming to his house. Upon the suggestion of Mr. Purington, I think, the permission was amended to include anyone having legitimate business with Milner. . . . . There was nothing said directly concerning any water disputes or water claims. When Milner first came into the courtroom Darrah presented him a paper, and asked him to look at it, and tell him whether he would pay it, an account of some kind. Milner picked it up and glanced at it, and threw it down again. . . . . To the best of my recollection at the very last moment Darrah again called Milner's attention to this account, as near as I can recollect, in these words: 'Milner, I want you to look at that paper, and give me a definite answer whether you will pay it or not.' Milner asked Darrah how much it was. He said it was seventy-five dollars. Milner then took the paper and an-

swered: 'I will not pay it until the court decides I have to.' Then Darrah made reply: 'Then I forbid you taking any water out of that ditch. If you want water you will have to go to the head of the ditch and get it.'" The bill for seventy-five dollars was for carrying water from the head of Milner's ditch to his turnout. In making the deed Milner had reserved, as has been said, thirty inches of water in Snow creek ditch. His flume and turnout were in place and use. Milner had been using the water for four years.

Upon the morning of the tragedy, which was the next day after this conversation, Duvoisney, Darrah's hired man, passed beyond the house of Milner, and proceeded, as he testifies he was under instructions from his employer to do, to tear out the flume from which Milner diverted water, and which was upon Milner's own land. This same witness testifies that his employer had said to him about two weeks previously that if he killed Milner and Barker he would die happy. Milner noticed the change in the condition of the water flowing past his house, and walking up the canyon unarmed found Duvoisney engaged in the work. He protested against it, and Duvoisney ceased and went away, saying he would have nothing further to do with it. Not long after Milner again noticed that the flow of water past his house was decreasing considerably, and concluded that Darrah was removing his flume. In view of Darrah's threats, and of the fact that Darrah carried a rifle, Milner, when he went up to investigate, took with him his shotgun, both barrels of which were loaded with buckshot. He had three other cartridges similarly loaded in his pocket. Reaching the point of diversion of the water he mounted a small rock and there saw Darrah engaged in tearing out his flume. This was the tragic meeting, and, as there was no eye-witness to it, the account is Milner's alone. Darrah was about thirty yards distant from Milner. Milner called to him in a loud voice to desist, holding his shotgun, both barrels cocked, in the hollow of his left arm, but not pointing toward the deceased. Darrah raised up, and, seeing Milner, answered: Shoot, you God damned, cowardly son of a bitch." Milner answered: "I won't do it, only I want you to get off my property. I don't intend to shoot if I can avoid it. I want you to get off my property." On the bank was lying a wet piece of board, which, glistening in the

sun, Milner thought was Darrah's rifle. Darrah moved away, approaching the piece of board. Milner shouted to him not to pick up the gun. Darrah passed the board and disappeared behind a large bunch of grass. Milner was still standing on the rock when, from behind the grass where Darrah had placed his rifle, Darrah raised up and fired at him. Milner was startled by the suddenness of the shot. One barrel of his gun, which was extremely "light upon the trigger," went off in the air, and as he fell or leaped from the rock he fired the other barrel as well as he could in the direction of Darrah. He ran for shelter over a ridge of land to a hollow beyond, and, as he passed the ridge in plain sight, Darrah fired again. Reaching shelter Milner crouched down and reloaded his shotgun. As he rose up Darrah was on the watch for him, and fired again. Milner immediately returned the fire, and Darrah fell. Milner went back to his house, and returned with a blanket with which he covered the body. Duvoisney was notified, and came and stood guard over the corpse. When it was discovered it was lying prone, with sixteen buckshot wounds in the front portions, ranging from the groin to the head. One had entered the heart, and by the testimony of the physicians immediate death was the probable result. The rifle was lying beside the body, the right hand of the deceased grasping the lever with which a fresh cartridge had been thrust into the barrel. By the body were found empty shells and a loaded cartridge, the cap of which had been struck by the firing pin, but not exploded. Mrs. Milner, first testifying to her knowledge of fire-arms, and her ability to distinguish the difference in sound between the report of a rifle and the report of a shotgun, swore that she heard the shots, and that the first shot was from a rifle. Another witness testified that all the shots were rapidly fired. The range of the wounds in the body of Darrah, according to the testimony of the physician upon the trial, was inward and slightly upward. The same witness, however, according to the record of his testimony, at the preliminary examination had testified that the range was inward and downward. To appellant's contention that a verdict of manslaughter is entirely unsupported by such evidence, respondent concedes that the testimony, if accepted without reservation, makes out a case of self-defense. But it is said that there are physical facts which are

absolutely at war with defendant's testimony. These facts, as set forth by respondent, are the following, and we quote from respondent's brief: "The witness Johnson testified that defendant showed him the spot where he, defendant, stood when he shot deceased, and where deceased stood at the time of the shooting, and that the spot where defendant stood was higher than the spot where deceased stood. This being true, the bullets from defendant's gun, upon taking effect upon the body of deceased, should take a downward course, unless deflected by striking a bone. The testimony of Dr. King is to the effect that the wounds on the body of the deceased had ranged slightly upward. This testimony is fatal to defendant's testimony as to the relative positions occupied by himself and deceased, and casts suspicion on all his testimony under the code rule." Johnson's testimony is as follows: "I saw him [defendant] point out a place where he said he stood when he fired a shot at Darrah. I examined the ground between these two places pretty carefully and closely near where the defendant said he stood when he fired. There were rocks, not as large by a good deal as a good many in that section of country, but too large for a man to carry. At the right of the way he would be standing, I suppose, I think there is a boulder, as I remember, to one side of that. I think I noticed at the time sufficiently to have a recollection as to who was on the higher or lower ground, the deceased or the defendant, and I think Milner was on higher ground a few feet." The testimony of King has already been adverted to. It cannot be said that this evidence either raises a conflict, or discredits the account of defendant. Depending upon the exact position of Darrah's body at the time when he received the fatal shot, the wounds might have ranged upward, as the doctor testified, and the shot still have been fired from the exact position which Milner indicated.

Respondent further answers in his brief: "The record discloses a number of hostile and threatening remarks made by defendant with reference to deceased, all tending to prove malice on defendant's part, and other remarks by defendant showing that defendant had no real fear of deceased. Shortly after the killing defendant said he was not afraid of Darrah's killing him." The hostile remarks to which reference is here made, and which defendant admits that he uttered, were to the effect that "the son

of a bitch [meaning Darrah] should not prevent him (Milner) from using his right of way." But the fatal affray was not over the right of way, and, while it is abundantly shown by the evidence that bad blood existed between the two, it uniformly appears that the defendant was the more contained of the two, and kept himself within the pale of the law. The declaration of counsel, that shortly after the homicide defendant said that he was not afraid of Darrah's killing him, is misleading when detached from its context. What he did say, by the testimony of a witness, is the following—and this it will be noted had no reference to the actual circumstances at the time of the tragedy: "Defendant said he was not afraid of Darrah killing him. The only thing he was afraid of was its ending just as it did. If it came to a shooting scrape, he had the best of it. He was not nervous, and never got excited, and Darrah was a nervous and excitable man." The other hostile declarations testified to as having been made by defendant were, "that he had already had Darrah arrested there to keep the peace. He said he failed to do it. He was turned out on his word, and he was not a man to keep his word. He [defendant] said he didn't know as it made much difference. He said he was going to watch that water, and he would watch it. No son of a bitch would keep him from doing it. He would take no chance whatever. There were several men could testify, if living, that he was capable of taking care of himself, but, thank God, they wasn't. . . . . He has ordered Barker not to go over it, but, by God, I am going over it. No son of a bitch can keep me. He gave me permission and, by God, I am going. If he opens his mouth, he had better keep it shut." The use of this language defendant denies, saying that he admits that he said no "son of a bitch could keep him from using his right of way;" but, accepting it, what shows it? That defendant believed Darrah was interfering with him in the enjoyment of his rights, as from the evidence Darrah certainly seems to have been; that defendant proposed to enjoy his rights, and that against such a man as Darrah, who had repeatedly threatened his life, he would take no chance whatever. What there may be in this language to have justified a verdict of manslaughter we are unable to perceive.

These are the only considerations presented by respondent as

supporting the verdict. One other circumstance appears from the evidence, and, though not called to the attention of the court in the brief of respondent, merits attention in this connection. Witnesses testified that, so far as their observation disclosed, no blood was found upon the ground by or under the body of Darrah. The physician was asked to say, from the character and location of the wounds, whether the person receiving them would have bled sufficiently to leave blood upon the ground. He answered that "it would depend upon the amount of clothing, et cetera, between the ground and the body to absorb the blood. Ordinarily, there would be blood on the ground from those wounds." Darrah wore two shirts and a vest, but no coat, at the time of his death. Whether this clothing was sufficient to absorb the flow of blood is not made to appear. It was for the jury to decide under the evidence offered. It is shown, however, that Darrah's body was pierced by small bullets, buckshot; that one of them entered the heart and caused almost instantaneous death, and that with the cessation of the heart's pulsations the blood would cease to flow from the wounds. The theory and argument of the district attorney were that Darrah was not shot where the defendant stated, but was shot elsewhere, and his body dragged or carried to the spot behind the bush.

The only fair conclusion to be drawn from all this is, that the defendant's evidence is not contradicted upon any essential matter by any other direct and positive evidence in the case. If this consideration could properly end here, there can be no doubt but that a new trial should be ordered for the reason urged that the verdict is contrary to the evidence, but a trial for murder differs in some respects from the trial of any other criminal offense. "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." (Pen. Code, sec. 1105.) In this case the killing by the defendant was clearly established by the people's proof. No circumstances of mitigation or justification to bring the case within the exception contemplated by the section were shown in the prosecution's evidence. The burden of proof,

then, of justifying and excusing the act, or of proving circumstances which would lessen the gravity of the offense to manslaughter, devolved upon the defendant. At the close of the prosecution's case the presumption against the defendant was that he had committed an unlawful homicide. It may not be said that the presumption of innocence countervailed against this, since by the express provision of the law the presumption of innocence was overcome and a presumption of guilt took its place when the required facts were proven. By section 2061, subdivision 2, of the Code of Civil Procedure, jurors are to be instructed "that they are not bound to decide in conformity with the declarations of any number of witnesses which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds." In this is a distinct recognition of the facts: 1. That a presumption is evidence; and, 2. That it is evidence which may outweigh the positive testimony of witnesses against it. It has been said that disputable presumptions are allowed to stand, not against the facts they represent, but in lieu of proof of the facts, and that when the fact is proven contrary to the presumption no conflict arises, but the presumption is simply overcome and dispelled. (*Savings etc. Soc. v. Burnett*, 106 Cal. 514.) This is true. Against a proved fact, or a fact admitted, a disputable presumption has no weight, but where it is undertaken to prove the fact against the presumption, it still remains with the jury to say whether or not the fact has been proven; and, if they are not satisfied with the proof offered in its support, they are at liberty to accept the evidence of the presumption. In the Burnett case, *supra*, both parties testified to a state of facts contrary to the presumption. It was like an admission; it relieved the question from conflict. But here the burden of proving circumstances exonerating the defendant, or reducing the grade of the crime, was cast upon him; and, even though there be no direct contradictory evidence in the record, the jury was not bound to decide in accordance with the defendant's statement, if the presumption the better satisfied their minds. In this connection the language of Justice Field in *Quock Ting v. United States*, 140 U. S. 417, is peculiarly applicable: "Undoubtedly, as a general rule," says the learned justice, "positive testimony as to

a particular fact, uncontradicted by anyone, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his own account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statement, although there be no adverse verbal testimony adduced."

In *Blankman v. Vallejo*, 15 Cal. 639, it is said: "We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears. A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him, or contradicting his statements."

In *People v. Lewis*, 36 Cal. 531, a verdict of murder was set aside by this court as being contrary to the evidence. In that case the fact of the killing by the defendant was not proved, and it is said that the defendant was convicted chiefly on the vague "impressions of a drunken witness," and that the testimony of the drunken witnesses "leaves it entirely in doubt whether the deceased may not himself, either by design or accident, have fired the shot which caused his death." But the distinction between the case of *People v. Lewis, supra,* and others like it, and the present one is both radical and important. In those cases the people failed to prove the defendants' commission of the homicide. It is easily possible for this court to say, when the identity of the slayer is in doubt, whether the evidence adduced is legally sufficient for the conviction of the defendant, and, if it be not, then clearly it is the duty of the court to set the verdict aside. Under such a state of facts no burden is cast upon a defendant to prove anything. In the case at bar, however, the killing by defendant is both proved and admitted. The burden then is by law cast upon him to exculpate himself, or mitigate the

gravity of the crime with which he is charged. He has to do this to the satisfaction of the jury. They are to weigh his evidence, and determine the fact whether or not it is to be believed, and, if believed, whether it is sufficient. How much or how little weight has the jury attached to his evidence? How much has the witness' credibility been affected in their minds by his appearance upon the witness stand, by his manner of testifying, by what may seem to them some improbability in his story? All these are considerations before the jury in passing upon the weight of evidence. In this case by its verdict the jury has in effect said: The burden of proof cast by law upon the defendant has not in our judgment been sustained. His evidence does not produce conviction in our minds against the presumption arising from the proofs of the people, which does satisfy our minds.

In such a case as this, therefore, the verdict of the jury may not be set aside for the lack of legally sufficient evidence to support it.

But other considerations demand that the defendant should be awarded a new trial. Dr. King, testifying to the wounds found upon the body of Darrah, said: "The wounds had a range slightly upward, except where the bullets struck bones, and were deflected thereby."

"Q. Does that indicate whether the person firing the shot, and from whom the shot was received, was either above or below the person receiving the shot?" The objection of defendant to this question was overruled, and the witness answered: "It would indicate that the muzzle of the gun was below the party receiving the shot, or rather it would indicate that the muzzle of the gun was below the point of entrance of the bullets." The admission of this evidence was incontestably error. (*People v. Westlake,* 62 Cal. 303; *People v. Smith,* 93 Cal. 445.) The very slightest consideration is enough to show that such a matter is not the subject of expert evidence, and that in fact neither a physician nor anybody else could tell the positions of the man who shot and the man who received the shot, merely from the course of the bullet. If a man were supine, and a pistol were discharged directly at him, or if the pistol were discharged at him when he was standing upright, or if it were discharged at him when he was in any one of a multitude of other positions, the result still might

be exactly the same in every case—a wound traversing the body in a given direction. Upon the other hand, if a man standing upright should receive a gunshot wound from a weapon whose line of fire was horizontal, nothing deflecting the bullet, the course of the wound would be horizontal. Yet, with the weapon held in exactly the same position, if his body was slightly inclined forward, the course with reference to it would be downward, while, if the body were slightly backward, an upward course would appear.

The coroner's jury inspected the scene of the tragedy. One Carpenter was with them. The defendant accompanied the jury, and gave his story of the homicide as he gave it upon the trial. He pointed out, however, upon the spot certain physical features of interest and importance, the flume, the rock upon which he stood, the bunch of grass behind which deceased picked up his gun and fired upon him, and the spot where he the [defendant] stood when he fired the fatal shot. To these declarations of the defendant the witness Carpenter testified. He further testified that at that time he discovered marks upon the brush caused by shot, and lead marks upon the rocks caused by shot, from one of which he actually picked a buckshot. The court deemed it advisable that the jury should view the premises, and gave its order accordingly. It made provision for the presence of the parties and their counsel, the officers of the court, and the stenographer, and directed that the places designated in the order should be shown to the jury by the witness Carpenter appointed for that purpose.

The places were: "1. The place where the dead body of S. J. Darrah was found by the coroner's jury; 2. To show to the jury the place where Milner said to the coroner's jury that S. J. Darrah stood when he called to him from the top of the rock; 3. The place where the defendant said to the coroner's jury that he stood upon a rock or boulder with a shotgun in his hands; 4. The place where defendant said to the coroner's jury that he reloaded his shotgun; 5. The place where defendant said before the coroner's jury that he stood when he fired the shot that killed S. J. Darrah; 6. The place where marks of buckshot on the rocks were found east of the place where the dead body of Darrah was found; 7. The tuft of grass from behind which the defendant

Milner said before the coroner's jury that Darrah picked up his gun; 8. The place where shot marks are on the brush, and the place or places where shot marks are on the rocks; 9. The Milner ditch and flume; 10. The Darrah ditch, commonly called Snow creek; 11. The place where the Milner ditch did divert the water from said Darrah ditch or Snow creek; 12. The trail where it crosses the Darrah ditch or Snow creek next below the said point of diversion of water in the Milner ditch and passes to the north and east of where Darrah's dead body was lying, and within about ten or twelve feet of the same."

The order was carried out, counsel for defendant neither objecting nor consenting to the order, but reserving as appears any legal objection which they might have to make to it. Arrived upon the ground, the terms of the order seem to have been obeyed with scrupulous exactness. Carpenter addressed the jury in the very terms of the order, saying: "This is the place where defendant said to the coroner's jury that he stood upon a rock or boulder with a shotgun in his hands." "This is the place where defendant before the coroner's jury said he stood when he fired the shot which killed S. J. Darrah," et cetera. Objection is now made, and was urged upon the motion for a new trial, that in this the jury received evidence out of court, other than that which came from an inspection of the premises. (Pen. Code, sec. 1181, subd. 2.)

The power of the court in regard to the matter under consideration is derived from and regulated by section 1119 of the Penal Code: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be taken in a body, in the custody of the sheriff, to the place, which must be shown to them by a person appointed by the court for that purpose, and the sheriff must be sworn to suffer no person to speak or to communicate with the jury, nor to do so himself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time." *Wright v. Carpenter*, 49 Cal. 607, was a civil case. The jury were permitted to view the premises, and instructed that they might use the evidence of the witnesses before them and their examination of the lands from such

inspection in determining whether they were rendered unfit for cultivation by reason of overflow. It was said by a bare majority of the court, two justices not participating, that this was error, in that it was not the purpose of the statute to convert the jurors into silent witnesses acting on their own inspection of the land, but only to enable them the more clearly to understand and apply the evidence; and it was reasoned that, if the rule were otherwise, the jury might base its verdict wholly on its own inspection of the premises, regardless of an overwhelming weight of evidence to the contrary, and the losing party would be without remedy upon motion for a new trial, since it would be impossible to determine how much weight was due to the inspection by the jury, as contrasted with the opposing evidence, or treating the inspection as in the nature of evidence, whether it was sufficient to raise a substantial conflict. In the criminal case of *People v. Green*, 53 Cal. 60, the order of the court was to this effect: "Mr. Nye, you will go with the jury and show them the position that you occupied during the transaction, and where the other parties were, and where Officer Collins was, and they can judge for themselves after that. There are not to be any explanations or comments made except to show the jury where these parties were at the time the thing occurred." It is said that this proceeding was erroneous, and that the action of the court was not only opposed to the letter of the code above quoted, but also to the purpose of the oath required to be administered to the officer who conducts the jury to the place mentioned in the order, and to the principle which gives to a defendant the privilege of being confronted by the witnesses against him. To the last proposition, that of the right of the defendant to confront the witnesses against him, no exception need be taken. It has since been declared to be error for the jury to receive a view of the premises in the absence of defendant. (*People v. Bush*, 68 Cal. 623.) But the very proposition upon which the case of *People v. Bush, supra*, was decided is, that in so viewing the premises the jury was receiving evidence, and this certainly is the case. If, for example, it were material to determine whether a hole in the panel of a door was or was not caused by a bullet, it would be permissible to remove the panel, to bring it into the courtroom, offer and have it received in evidence, and submit it to the inspection

of the jury. It would not for a moment be doubted, if this procedure were adopted, but that the physical object was evidence in the case. If, instead of so doing, the court should direct that the place where the material fact occurred should be viewed by the jury, and the jury should be conducted to the spot, and the panel of the door pointed out to them, would it be any the less the reception of evidence because obtained in this way? Certainly not; and, indeed, the criminal code recognizes that evidence is thus received when it declares that a new trial shall be granted when the jury has received evidence out of court other than that resulting from a view of the premises. It must be concluded, therefore, that the doctrine of *Wright v. Carpenter, supra,* has been set aside by the later utterances of this Court. So, also, has the ruling in *People v. Green, supra,* been reversed by the later case of *People v. Bush,* 71 Cal. 602. In that case the witness Bundy was instructed by the court as to the places to be viewed, precisely as was done in this case. In so doing he orally named and designated the places, as was done by the witness here. The objection was based, as is this objection, upon the language of the code, and it was urged that the law forbade any person from speaking to the jury upon any subject connected with the trial, and that for the witness Bundy so to do was in direct violation of the language of the law. But to that this court in Bank replied that the objection was without merit, "for we cannot conceive how he could have shown the jury the two places which they were sent to view, in any other way under the statute."

We perceive no error, therefore, either in the order or in its execution.

The matter of the citizenship of the juror Dole, and of the right of the defendant to raise the question, either in an attack upon the judgment, or upon a motion for a new trial, has not been overlooked, but as a new trial must be ordered, and as the juror could not again act in the case, it becomes unessential to this consideration.

No other of appellant's points seems to require particular consideration; but for the reasons given the judgment and order are reversed, and the cause remanded.

Temple, J., and McFarland, J., concurred.