[Crim. No. 1774. Second Appellate District, Division Two.—April 22, 1929.]

THE PEOPLE, Respondent, v. J. W. MONTGOMERY, Appellant.

L. A. West and B. Z. McKinney for Appellant.

U. S. Webb, Attorney-General, and Waldemar Augustine for Respondent.

THOMPSON (IRA F.), J.—The defendant was indicted by the grand jury of Orange County. The indictment contained two counts, the first charging him with the murder of John D. Callicott and the second with the murder of Orlie R. Mahon. The jury acquitted defendant of the first count, but found him guilty of manslaughter under the second charge. The appeal is from the judgment and from an order denying a motion for a new trial.

The appellant on November 15, 1928, was employed by the California Gun Club as keeper and caretaker of its grounds, ponds and hunting blinds and for the purpose of spreading grain in the ponds to attract aquatic game birds. It was also his duty to warn trespassers off the property, advising them that it was private, and not open to the public for hunting, and presumably to make this work the easier for him, the land was inclosed by fences except across a slough where tide-water ebbed and flowed, and it was sur-

rounded by an embankment from a half to two and one-half feet in height. Between 1 and 2 o'clock P. M. on the day in question the appellant heard a. commotion in the pond, which investigation disclosed was caused by a dog, unaccompanied, so far as appellant could see, by its owner, chasing and frightening the birds away. The appellant drove down the road in his automobile near to the place where the dog was creating the disturbance. His shouts to the animal proving unsuccessful, the appellant fired two shots from a 32-caliber rifle into the water from ten to fifteen feet behind the dog for the purpose of frightening him. Upon firing the second shot, the appellant saw two men rise up from behind an embankment about 150 yards distant from him. These men, who were the victims of the affair, began to shout at the appellant and to approach him. When about seventy-five yards away appellant says that he for the first time could hear and understand their language. He says they were cursing and abusing him, using foul, abusive and offensive epithets. Each of the decedents was carrying a 12-gauge pump shotgun. The appellant further testified that after the decedents approached him a bit closer he said to them: "Gentlemen, let's reason this thing. There is no use of us getting into trouble." Probably no more concise statement can be made than that of the witness to the succeeding events. He said: "Well, when they got about I guess thirty or forty steps from me they turned west to get up on the dike and the big fellow (Callicott) got up on the dike and he says, 'You G—— d—— cowardly s—— of ——, I am going to shoot you just like you shot my dog,' and he whirled and shot at me and I jumped to the left and it missed and I fired at him and hit him. I didn't have time to take sight, and I threw a shell out and the other man was facing west with his gun down like this and when this biggest fellow dropped why he whirled around and as he whirled around why I shot and he shot, and you couldn't hardly tell the difference. I don't know whether he had shot or not." Mahon was hit and fell to the ground as Callicott had done. The appellant also testified that Mahon did not succeed in getting the butt of his gun to his shoulder nor did the witness when he fired. After the shooting the appellant says that without disturbing the bodies he went to his

home two or three miles distant; called up the sheriff's office, gave information of the tragedy and said that he would be waiting for someone to come for him. Two officers proceeded to the scene accompanied by the appellant. There they found, according to one of the officers, the tracks of the decedents approaching the fatal spots as described in the testimony of appellant, the two bodies, and the two shotguns. There was an empty shell in each gun and there were no tracks approaching the bodies from the place where the appellant said he was standing.

It should be noted at this point that appellant was the only witness to this fatal affair. Concerning the shots he is corroborated by the testimony of three witnesses. A Mrs. Brokoff testified that she lived about half a mile from the California Gun Club; that she was experienced in the use of firearms, having used them for fifteen or sixteen years in Texas; that on the day in question and between the hours of 1 and 2 o'clock P. M. she heard from the direction of the mentioned club two rifle shots, "then in a period of a few minutes a shotgun shot and another rifle shot, and then the last two shots was a rifle shot and a shotgun shot which were right together, almost." Mr. and Mrs. Spies, also residing about half a mile distant, testified. Mrs. Spies said that at the time mentioned she heard "four rapid shots, almost simultaneously." Mr. Spies said he heard from the direction of the club some shooting and then for "about five to ten minutes . . . everything was quiet, then I heard two rifle shots, they came, oh, maybe, two minutes apart, then after that there was a shotgun shot and a rifle shot close together, and right after that two more shots, but I couldn't say which was first or last, they came so close together, just like one shot, but I could distinguish the rifle shot from the shotgun shot." We also add that several character witnesses testified on behalf of the appellant.

We have recited the testimony in considerable detail because the appellant insists that the evidence is insufficient to support the verdict. It will be observed that all of the testimony so far set down indicates very forcefully that the appellant shot both of the decedents in self-defense—and such could have been the only theory by which the jury absolved the appellant of guilt as respects Callicott. The

respondent urges that there is substantial testimony supporting the verdict. Counsel directs our attention to the testimony of Dr. Alice L. Thompson, who performed the autopsy. She says that the bullet which killed Mahon "passed in between the first and second ribs, shattered the second rib, then through the anterior border of the right lung, then through the left lung, at the root of the lung, piercing the pulmonary blood vessels, thence past to the border of the left fifth rib and was deflected upward and hit the point of the left scapula and passed out of the body." To this statement of the witness should be added her answer to the effect that the point of entrance was on the right of the mid-line of the body in front, and her statement on cross-examination that possibly the second rib would deflect the bullet. The attorney-general argues that this testimony in connection with the fact that Mahon was right-handed in the handling of firearms is sufficient to justify the jury in doubting the veracity of the appellant, and in adopting the theory that when the appellant had shot Callicott he turned and aimed at Mahon, who, fearing for his life, shot in self-defense. He also, asserts that it is strange that two hunters would fail to hit the appellant when firing at him from a distance of eighty feet with 12-gauge shotguns. These are the only things which respondent urges to overcome the direct and positive testimony of the appellant and all that we can find in a perusal of the transcript, with the exception of the responses by the witness Dr. Wagner to the following questions:

"Q. Assuming then that a bullet is fired from a distance of 27 paces from a 32-caliber Winchester rifle, Remington rifle, with a bullet of the kind contained in People's Exhibit No. 2; that that bullet strikes a person at that distance of 27 paces between the first and second ribs about an inch and a half below the clavicle at the right of the front mid-line of the body, striking the upper edge of the second rib and shattering the rib and passes entirely through the body striking a rib at the back side on the left side and then passes out of the body, would you be able to say whether that bullet in your opinion was deflected from its course at the point of entrance upon striking the bone at the second rib.

"A. I can express an opinion, yes, sir.

"Q. Assuming the state of facts just described to you, in your opinion was that bullet deflected from its course?

"A. It was not."

Assuming for the moment that the objection interposed by the defense was properly overruled by the court, what do we make out of the testimony? ██ The question ignores the position of the person shot. It fails to take into account either his horizontal or his perpendicular position. It ignores the comparative levels of the two men. It fails to disclose to the witness how much of the second rib was struck or how badly it was fractured, and yet the angle of flight upon the curve of the rib might have considerably altered the situation. It takes it for granted that the ribs or bones of all men are comparable in their power of resistance, although it is a matter of common knowledge that they vary materially. It assumes that all 32-caliber bullets have behind them the same powder load. It overlooks the velocity and direction of the wind, if any there was. There are so many elements lacking in the question that it could hardly have been intelligently answered except from one factor only, to wit, the actual course of the bullet through the body. If it be said that the testimony of the witness is of value from this standpoint we must remember that he did not perform the autopsy and as he answered upon the hypothetical question only he was giving a valueless opinion, and one which merely attempted to fortify the argument of the prosecution that the deceased must have been in a certain posture when he was shot, by the opinion of one whom the jury may well have believed to be more skilled than they in such matters. Again assuming that there was no deflection of the bullet upon striking the second rib and that it did in its natural and direct course pass through the body from right to left, there is still no necessary inconsistency between this fact and the testimony of appellant. It must be remembered that, from the fact that Callicott and Mahon were companions and had been apparently acting in concert, appellant was justified, after having killed Callicott under circumstances which impelled the jury to find that he shot in self-defense, in interpreting the slightest hostile move by Mahon as indicative of the latter's intention to exact the life of appellant. The appellant testified that when he shot Callicott, Mahon, who had

been facing Callicott swung around with his gun to shoot, but didn't get it above his waist line when he (the appellant) "guessed at the biggest part" and fired. He does say, however, that Mahon raised his gun first. It is apparent therefore that although decedent was right-handed he did not take formal aim before shooting and may, at the time, have been exposing more of his right than his left side. That Mahon did not take aim before he fired probably explains why he did not hit the appellant. ▇ Everything which is said to support the verdict is speculative and conjectural. If, as respondent says, the jury adopted the hypothesis that Mahon fired in self-defense, we are compelled to reply that while as a hypothesis or supposition it may well serve as a drill ground for mental gymnastics, yet when it rests upon the basis of imagination and is unsupported by substantial testimony it is not sufficient to convict a person of manslaughter. The state is just as intensely interested in protecting the innocent man as it is in convicting the guilty, and when the theory opposed to direct and positive testimony of innocence is so unsubstantial and nebulous as not to raise in a fair and reasonable mind an honest question, it must be said to be insufficient.

▇ We now pass to the claim of appellant that the court erred in overruling the objection to the hypothetical question asked of Dr. Wagner, which we have already quoted. The argument is made that the question did not cover the subject of expert testimony and that the proper foundation was not laid. In addition to what has already been said concerning this question it should be noted that had the question been reversed and the witness asked to state the position of the decedent from the course of the bullet it would have been held improper on the authority of *People* v. *Durrant,* 116 Cal. 217 [48 Pac. 85], *People* v. *Milner,* 122 Cal. 181 [54 Pac. 833], *People* v. *Farley,* 124 Cal. 594 [57 Pac. 571], and *People* v. *Overacker,* 15 Cal. App. 620 [115 Pac. 756]. Here the effort is made to prove the position by proving an undeflected course. We do not see that the question is objectionable for the same reason as that assigned in the cases cited. But we think that proof of the fact should have been made of the actual course by the person or persons who performed the autopsy. Dr. Wagner stated in his effort to qualify himself as a witness that his

experience had been gained in examining "many cases of gunshot wounds of a similar nature passing through bones, passing through ribs" and that it was a part of his "business to determine the course and whether deflected or whether they passed in straight lines." In other words, his experience had been gathered in the actual examination of the wounded bodies and not in computing velocity, density and resistance. The court was in error in overruling the objection.

Assignments of error are also predicated upon the giving and the refusing of instructions, but we think comment thereon is unnecessary. From all that appears, the jury was fully and fairly instructed.

Judgment and order reversed.

Works, P. J., and Craig, J., concurred.