## EVERETT *vs.* THE STATE OF GEORGIA.

62  65
95  456

62  65
123  778

62  65
130  482

1. What the prisoner said on being arrested some hours after the assassination, and two miles distant from the place where it was committed, is not evidence in his favor.
2. Threats by the prisoner against the life of the deceased are admissible in evidence, though made some years before the assassination.
3. One who is not an expert or practicing physician may, after describing the wound, give his opinion that it caused death, and may give his opinion, with the reasons therefor, that the deceased could not possibly have inflicted the wound on herself.
4. Even in a case of homicide, a request to charge may be denied, if the matters embraced in the request have been fully and correctly submitted to the jury in the general charge as given.
5. Where the whole charge is in the record, and the same, taken all together, is fair and full, and lays down substantially the law of the case as applicable to the facts in evidence, mere inaccuracy in some of the language will be treated as immaterial, the correction being virtually made by the general import and spirit of the instructions.
6. Though the evidence is all circumstantial, it is sufficient, if the jury believed it; and that they did believe it is apparent from their verdict.

Criminal law. Evidence. Threats. Witness. Experts. Charge of Court. New trial. Before Judge CRISP. Macon Superior Court. December Term, 1877.

Everett was placed on trial for the murder of Antoinette Felton, alleged to have been committed on August 25th, 1877. He pleaded not guilty. The evidence against him was purely circumstantial. The case as made was, in brief, as follows:

On Saturday, August 25th, 1877, the body of deceased was found in a thick piece of woods, about fifty yards from the public road leading from Montezuma to Marshallville; there was a severe bruise on her head, and her throat was cut from ear to ear, the head being nearly severed from the body.      This place was one-half mile from the defendant's house.      The body was found at about two o'clock P. M.      At the time of her death deceased was about seventeen or eighteen years old.      She was the sister of defendant's wife, and had been living with him since she was a very little girl.      About three years before she had given birth to a child which was recognized by the defendant as his.      He showed great attachment for her.      He was a leading man in the church at the time of the birth of this child, and subsequently became a preacher, if he was not then.      This event (the birth of the child) seriously impaired the harmony of his family and church relations, and when angry, in discussions growing out of the matter, he stated several times that he would kill her (deceased), or be killed himself before any other man should have her.

To the admission of these threats defendant objected on account of the time which had elapsed since they were made before the homicide.      They were nevertheless admitted, and he excepted.

From then until deceased's death, he showed great jealously of the attention of other men to her.      As she grew older these attentions increased, as also did the morose jealousy of the defendant.      Deceased was a "likely" mulatto girl, and popular with the young negroes of the neighborhood.      Cicero Osby was quite attentive to her, and was therefore especially obnoxious to defendant.      There was every reason to suppose that he was engaged to be married to her.      On the evening before her death, about an hour before sunset, she left defendant's house in company with other young men and women, to attend church.      She did not return home that night, but went to her brother's, about one mile from defendant's, in company with Cicero.      At

about sun-up, before breakfast, she left for home, and that is the last time she was seen alive by any reliable witness. On the side of the road, near where the body was found, was a place where some one had been seated. Tracks, similar to those made by defendant, were traced to within about three hundred yards of the place of the homicide, and by one witness to within sixty yards. About the time deceased left on Friday evening, defendant, unexpectedly to his other hands, resumed work, and as deceased did not come, he went down the road after her to bring her back, but failed to overtake her. He had seen Cicero talking to her, and knew he was with her. It was supposed by the hands, consisting of deceased, her step-father, and defendant's daughter, that they had "knocked off" for the week. On the next morning defendant arose unusually early, and, after feeding his mules, disappeared until between nine and ten o'clock. He then changed his clothes and carried a load of water-melons to town. He was arrested between three and four o'clock, partially inebriated, something unusual for him. He was foreman of one of Mr. Felton's places, and from his boyhood had been a laborious and trusted servant. At the time of his arrest, when asked for his weapons, he gave up a pocket-knife, but subsequently produced a razor which he said one Hafers had given him to carry to Langley to be sharpened. Hafers testified that this statement was true. No blood was found on either the razor or the knife.

When the deceased did not return home on Saturday morning, her mother, whom she had promised to return early, sent a boy to her brother's to ascertain the cause of her delay, and when it was ascertained that she had left her brother's early in the morning, the colored population of the neighborhood set out to find her, and her body was found in the condition above stated.

L. M. Felton, not a physician, testified as to the wounds, position of the body, etc., and gave it as his opinion that she could not have inflicted the wounds upon herself.

P. Timberlake testified that from the description of the

wounds in evidence, they produced death ; that he had been a practicing physician for more than twenty years of his life, but was not then, except in his own family.

To the evidence of Felton and Timberlake above stated, the defendant objected. The objection was overruled and he excepted.

A witness, Wade Hangabook, testified to having seen the defendant seated on the side of the road near where the body was found at about ten o'clock on the morning of the homicide, and that he saw deceased come up the road to where he was, and accompany him in the direction of where she was killed.

This witness was severely impeached in an attack upon his character and his intelligence, and by showing that it was impossible for him to have been where he testified he was at the time indicated.

The jury found the defendant guilty, but recommended his imprisonment in the penitentiary for life. The defendant moved for a new trial upon the following grounds, to-wit :

1. Because the court excluded the statement made by defendant at the time of, and soon after his arrest, to the effect that on the Friday evening before the homicide he went up to Mr. Baldwin's house, following the deceased and others, looking after his cow, and that he then saw sitting in Mr. Baldwin's front porch three men, to-wit: old Mr. Baldwin, J. T. Baldwin, and another person, a stranger to him.

The only effect that this evidence, if admitted, would have had on the case, would have been to show that defendant was in search of his cow rather than following deceased, and to corroborate his statement to the jury that the tracks by which it was sought to implicate him, were made on the preceding evening, as it was shown by other reliable testimony that the persons described by defendant were in Mr. Baldwin's piazza at the time stated, and that they could have been seen from the point where the tracks were lost by reason of entering the woods.

2. Because the court admitted the threats as above stated.

3. Because the court admitted the opinions of Felton and Timberlake, as above set forth.

4. Because the court refused to give a certain request in charge. As to this ground, it is only necessary to state that the request was fully covered by the general charge.

5. Because the court erred in charging as follows : "It is not enough that the evidence goes to show guilt ; it must be inconsistent with the reasonable supposition of his innocence. But when evidence is so inconsistent with the supposition of one's innocence, then, gentlemen, there is no reason why jurors should not convict on circumstantial evidence. Whilst it is true that a man ought not to be punished for an offense of which he is guiltless, the jury ought not to pronounce a man innocent for the want of positive evidence of his guilt. ' Circumstances satisfactorily proven, which point to the guilt of a party, and which are irreconcilable with the hypothesis of his innocence, or which require explanation from him and may be explained by him if he be innocent, but which are not so explained, ought to satisfy the conscience of every juror, and justify him before that forum for rendering a verdict according to their almost unerring indication. Any other rule would expose society to the ravings of the most depraved men. The most atrocious crimes are committed in secret, and are perpetrated generally under circumstances which preclude the introduction of positive proof of the guilt of the person or persons who committed them."

6. Because the verdict was contrary to the law and the evidence.

The motion was overruled and the defendant excepted.

ALLEN FORT; J. A. EDWARDS, for plaintiff in error.

C. B. HUDSON, solicitor-general, by B. P. HOLLIS ; JOHN R. WORRILL, for the state, cited 54 *Ga.*, 244; 57 *Ib.*, 102; 55 *Ib.*, 196; 43 *Ib.*, 483; 1 *Ib.*, 610; 2 *Ib.*, 1, 3; 28 *Ib.*, 192; 32 *Ib.*, 390.

BLECKLEY, Justice.

1. The declarations of the prisoner, offered in his be-half as evidence, were no part of the *res gestœ*, either of the walk which he took on the afternoon previous to the assassination, or of the assassination itself. From the ending of the walk, the declarations were separated by the interval of a whole night and much of the following day, and from the ending of the assassination, they were separated by several hours. In locality they were separated from the scene of either event by the distance of two miles.

2. The threats proved as made by the prisoner against the life of the deceased, were threats of jealousy, not of ordinary rage or anger. They were not recent, but the evidence indicates that the passion which prompted them was still in full heat, and, instead of abating since the threats were made, that it had been lately rendered more intense by the prospect of the girl's approaching marriage. He had long ceased to utter threats, but as his illicit relations with her continued, and his interest in her was not lessened, his purpose to sacrifice her rather than see her possessed by another, as openly declared some years before, was possibly not the less settled because cherished more discreetly in silence. The threats to which the witnesses testified, showed that his mind was formerly turned to the awful means of baffling his rivals which his or some other hand ultimately employed. He had thought of slaying her to prevent others from enjoying her, and sure enough, when the time grew near for her to be married to a man of her choice, she was horribly butchered in the woods not far from the prisoner's house. Is there a doubt that his old passionate threats, the offspring of the sort of love that can kill, are calculated to cast some light, though dim and indistinct it may be, on the tragic end of this poor, guilty girl? Our concern with them at present is only to see that they are admissible evidence, and we so pronounce them. *Shaw vs. The State*, 60 *Ga.*, 246.

3. Doctor Timberlake had, for more than twenty years of his life, been a practicing physician, and, though he had retired as a general practitioner, was not wholly separated from practice at the time of the trial. He still practiced some in his own family. But irrespective of this last circumstance, we think he was an expert relatively to the special subject matter on which he was examined. One who had ever studied anatomy and physiology sufficiently to become a physician, would not be likely to err in forming opinions upon such questions as Dr. Timberlake was called upon to answer; such as, the force by which blood would flow from a wound in the throat, made by cutting while in life or after death; whether the blood would be likely to touch and stain the clothing of the person who made the incision; what artery would have been severed by the gash described; whether the deceased could have inflicted it upon herself, and with what result as to the jetting out or spirting of the blood; what differences in the effects would have ensued from different positions of the body; what degree of force in a blow would be required to suspend animation so as to arrest the flow of blood, etc. As to the sufficiency of the wounds described to produce death, there could be no possible doubt. The witness Felton, was not an expert, but in giving his opinion concerning the wounds, etc., he rendered his reasons by stating the facts. Code, §3867. He saw for himself all the facts on which his opinion was based, both as to the wounds and the apparent impossibility that the deceased could have inflicted them upon herself, and these facts he detailed to the jury.

4. The general charge of the court embodied the substance, and almost the language, of the request to charge made by the prisoner's counsel. Even in a capital case, a request may be declined where to give it would be a mere repetition of what has already been fully and correctly delivered.

5. The entire charge of Judge Crisp is in the record;

taken all together, it is fair and full, and lays down sub-
stantially the law of the case as applicable to the facts in
evidence.   A nice verbal criticism would discover, perhaps,
a few inaccuracies of expression, but these may be treated
as immaterial, since they are checked and virtually correct-
ed by the general import and spirit of the instructions.   If
the language excepted to in the motion for a new trial stood
alone, there would be difficulty in arriving at the exact
meaning of the judge when he says, "Circumstances satis-
factorily proven which point to the guilt of a party, and
which are irreconcilable with the hypothesis of his inno-
cense, *or* which require explanation from him and may be
explained by him if he be innocent, but which are not so ex-
plained, ought to satisfy the conscience of every juror, and
justify him before that forum for rendering a verdict ac-
cording to their *almost unerring indication.*"   The charge in
its completeness is too lengthy for insertion in this opinion,
but from an examination of it, we are satisfied that no
mistaken impression was produced upon the jury by the
foregoing extract.   The judge did not intend to express his
opinion that the circumstances of this particular case in-
dicated guilt, but that it was in the power of circumstances
to indicate guilt with a precision almost unerring; nor did
he mean to say that a conviction could be had in any case,
though the circumstances, as left by the proof. were recon-
cilable with the hypothesis of innocence.   His meaning
was, that though there can be no conviction unless the
circumstances are irreconcilable with the hypothesis of in-
nocence, yet, the circumstances may be considered as being
of this character when they are such as to require explana-
tion, and none is given, if to give it would be in the par-
ty's power were he innocent.

6. Both the credit and the intelligence of the witnesses
were for consideration by the jury.   The evidence was cir-
cumstancial, but if the jury believed the facts narrated to
be all true, they could have reasoned therefrom to the guilt
of the prisoner without subjecting the facts to any violent

strain. We do not undertake to say that the prisoner is guilty, as an original proposition. All we can affirm is that he was legally convicted.

Judgment affirmed.