### STATE v. BRADLEY.

1. DYING DECLARATIONS.—The rules stated for determining what are dying declarations and governing their admissibility in evidence. Where deceased within twenty-four hours of his death, and a few hours before becoming speechless, said that "Angus has killed me," and that he had to die, that Angus had killed him, what deceased then said was admissible in evidence as a dying declaration against Angus when tried for the murder of the declarant. The uncommunicated opinion of the attendant physician that death was not then imminent does not affect the question.

2. EXPERT TESTIMONY—ORDINARY OBSERVATION.—Whether a wound could have been inflicted by the injured party falling on an open knife held in his own hand, is not a matter as to which a surgeon is specially qualified by study or experience to give an opinion.

Before HUDSON, J., Aiken, April, 1890.

This was an indictment against Angus Bradley, charging him with the murder of Jasper Craig on December 26, 1889. While a son of the deceased was on the stand as a witness for the prosecution, the following was admitted by the trial judge as a conversation between prisoner and deceased, and not as a dying declaration:

Q. State whether or not he said anything to Angus? A. He said, "Angus, you have killed me."

Q. What did he say, anything? A. He said, "Angus, you have killed me." Angus said. "Uncle Jasper, I didn't do it," he said. "If you didn't do it, who did?" and Angus hung his head down this way (shows), and didn't give him any answer.

Afterwards, the widow of deceased being on the witness stand, the following occurred:

Q. Were you there when he died? A. Yes.

Q. I want you to state whether he said anything about his condition. Did he express any hope of recovering? A. No, he did not.

Q. (By the Court.) When did he begin to die? A. Well, as far as I can recollect, that morning. .

Q. When did he cease to speak? A. In the night, some time.

Q. About what hour? A. I don't know about what hour, because I was lying down.

Q. And you say he expressed no hope of living? A. He expressed no hope of living.

Q. What did he say about dying? A. He never said anything only, "Lord have mercy on me."

The Court: "It is proposed now by the State's counsel to introduce his declaration made to the one receiving his dying declaration. It is objected to by defendant's counsel on the ground that there is not sufficient proof to admit such as dying declaration. I hold that as far as the evidence goes, it shows very clearly that he was *in articulo mortis;* that he was fully conscious of the fact; that all hope of life had departed from him, and therefore statements made when he was in that frame of mind are admissible." Mr. Henderson excepted to the ruling.

Q. State what Jasper said after he had stated about dying? A. He said Angus Bradley had killed him, that's what he stated to me.

Q. Were you in there at the time there was talk between Angus and himself, did you hear that? A. Angus was in there when he said that.

Q. Did you hear him say anything to Angus, and Angus's replying to him? A. Angus told him he didn't kill him.

Q. What did your husband say? A. He said, "Angus, you know you killed me."

Other matters are stated in the opinion of this court.

*Messrs. Henderson Bros.*, for appellant.

*Mr. Murphy*, solicitor, and *Messrs. Croft & Chafee*, contra.

June 17, 1891. The opinion of the court was delivered by

Mr. Justice McIver. Under an indictment for the murder of Jasper Craig, the appellant was convicted of manslaughter

and sentenced to confinement in the penitentiary for the term of three years. From this judgment he appeals upon the several grounds set out in the record.

It appeared that in an altercation between these parties, which took place in the yard of the deceased about dark in the evening, the deceased received a mortal wound inflicted by a knife, and was soon after carried into his house, where he died some time near the middle of the next day. One witness, the son of the deceased, testified that he saw the prisoner strike the mortal blow, while other by-standers testified that they did not see prisoner strike any blow, but that they saw or heard deceased fall. All the parties were drinking, more or less, and the defence was that the deceased, being much under the influence of liquor, in striking at the prisoner fell upon his own knife, and thus received the mortal wound.

The first, second, and third grounds of appeal impute error to the Circuit Judge in his rulings as to the admissibility of certain testimony, while the fourth ground, which has very properly been abandoned, as it manifestly could not be sustained, complains of error in the charge to the jury. The testimony alleged to have been erroneously admitted by the first and second grounds of appeal, was as to what passed between the deceased and the prisoner, shortly after the wound had been inflicted, and after deceased had been carried into his house, and the prisoner had been brought in. When this testimony was first offered, the judge, conceiving that the proper foundation had not then been laid for the admission of such testimony as a dying declaration, declined to receive it as such, but ruled that it was competent as a conversation between the deceased and the prisoner; and it is to this ruling that exception is taken by the first ground of appeal. Afterwards, however, when the Circuit Judge considered that a proper foundation had been laid, he ruled such testimony competent as a dying declaration; and to this ruling the second ground of appeal is directed.

If, therefore, this testimony was admissible as a dying declaration, it is unimportant to consider whether it was competent as a conversation between the parties. We will therefore confine our attention to the question whether the testimony in question was

admissible as a dying declaration. The rules upon this subject are so well settled that we need not do more than state them briefly. 1st. Death must be imminent at the time the declaration is made. 2nd. The declarant must be so fully aware of this as to be without hope of life. 3rd. The subject of the charge must be the death of the declarant, and the circumstances of the death must be the subject of the declaration. *State* v. *Johnson* (26 S. C., 152), and the cases therein cited. That death was imminent in this case is demonstrated by the fact that it followed within twenty-four hours after the declaration in question was made. When the deceased was carried into the house a little after dark he fainted, and when he regained consciousness temporarily, the declaration in question was made, and but a few hours afterwards—about midnight—he became speechless and remained in that condition until he died about the middle of the next day.

Next, was the declarant so fully aware of his condition as to be without hope of life? The language of the declaration itself shows this—"Angus has *killed* me." *State* v. *Quick*, 15 Rich., 349. But in addition to this, he not only expressed no hope of living, but said "that *he had to die*, that Angus had killed him." *State* v. *McEvoy*, 9 S. C., 212. The fact that the attending physician says, *in his testimony*, that, after examining the wound, he did not think it would be "necessarily fatal—didn't think he would die," cannot affect this question, unless it had appeared that he had expressed such opinion to the deceased. The deceased manifestly believed that he was about to die of that wound, and it does not appear that the doctor either said or did anything calculated to remove or even shake that belief. As to the third requirement of the rule, it is too clear for argument that it was fully met. It is clear, therefore, that there was no error in admitting the testimony in question as the dying declaration of the deceased as to who killed him, on the trial of a case for the murder of deceased.

The third ground of appeal complains of error in ruling out the following hypothetical question propounded to Dr. B. F. Wyman, "an expert surgeon": "If, in a particular case, the facts be as follows: two men, say Craig and Bradley, are seen

very near each other, both with drawn knives, Craig, being very drunk, cuts at Bradley but misses him, whereupon with his left hand he seizes Craig's right arm and pushes it from him towards Craig. and at the same time with his right hand seizes Craig's left shoulder, and gives him a severe blow which fells him to the ground; afterwards it is found that Craig has a knife wound about two and a half inches long, below and to the left of the left nipple, which enters the cavity and touches the heart and passes out, ranging to the right, so much so that the shirt is cut in that direction, is it probable and possible, from this state of facts, that Craig was wounded by the knife he held in his own hand?" To say nothing of any other objection to the proposed question, we think the question was properly ruled out upon the ground that it required no special knowledge, skill, or experience to enable one to give an opinion as to the matter inquired about, and hence was not a proper subject for expert testimony.

In 7 Am. & Eng. Encycl. Law, 491, it is said: "Expert evidence is that given by one specially skilled in the subject to which it is applicable, concerning information beyond the range of ordinary observation and intelligence." And again, on the same page of that very valuable and useful compendium of the law, it is said: "An expert is one who has made the subject upon which he gives his opinion a matter of particular study, practice, or observation, and he must have a particular and special knowledge on the subject." Now, however expert and skilful Dr. Wyman may be as a surgeon, and however competent he may be to express an opinion upon a subject involving a knowledge of anatomy, we can hardly suppose that either he, or any one for him, would claim that he had ever given the subject inquired about any special study, practice, or observation, or that he had any special knowledge on the subject. On the contrary, we would suppose that any intelligent person of ordinary experience would be quite as competent to express an opinion as to whether, under a given state of facts, it would be probable or possible for Craig to have inflicted the wound from which he died by falling upon his own knife, as the most learned and experienced surgeon could be. The question, therefore, was calculated to elicit an opinion from the witness as to a matter involving no special

knowledge or skill, which the jury was quite as competent to form as the witness, and it was therefore clearly incompetent.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.