[Crim. No. 897.   Third Appellate District.—May 25, 1926.]

## THE PEOPLE, Respondent, v. CHARLES COKER, Appellant.

[1] CRIMINAL LAW—MURDER—VENUE—EVIDENCE.—In this prosecution for murder, the evidence having shown that the victim was found in an automobile, under circumstances which impelled the conclusion that the car was not driven by him after the infliction of the wounds, that he was taken to a hospital, where an examination disclosed that he had upon his person wounds which could not have been self-inflicted, and the character of the wounds having indicated that a long sharp instrument had been used, and that an instrument with which a like wound could be inflicted was found in defendant's car with blood upon it, all in the county in which

the defendant was being prosecuted, the venue of the offense was sufficiently established and the jury was justified in coming to the conclusion that the victim had been killed in that county.

[2] ID.—CORPUS DELICTI — INSTRUMENTALITY USED — CORROBORATION— EVIDENCE.—In such prosecution, the homicide having been fully established by the testimony of the attending physician that the deceased was mortally wounded by a long sharp instrument, that the wounds were of such a nature as to be practically impossible of self-infliction, and that the deceased came to his death by reason of such wounds, an ice-pick which was found in defendant's car covered with blood was properly admitted in evidence as a means or instrumentality by which the offense was committed and as corroborative of defendant's statement showing the use of the ice-pick in the commission of the offense.

[3] ID.—CORPUS DELICTI—EVIDENCE—CONFESSIONS.—In a prosecution for murder, while the *corpus delicti* may be established by direct or circumstantial evidence, all the elements of the crime, but not necessarily defendant's connection with it, must be made to appear before the defendant's extrajudicial admissions or confessions are admissible for any purpose, and they cannot be used to establish any necessary element for the commission of the crime.

[4] ID.—FINDING OF DEAD BODY—CRIMINAL AGENCY.—In a prosecution for murder, proof of the finding of a dead body does not establish the *corpus delicti*, but it must be shown that death was the result of criminal agency.

---

(1) 16 C. J., p. 769, n. 91.   (2) 16 C. J., p. 618, n. 34, p. 619, n. 36, 42, p. 737, n. 51, p. 772, n. 29, 30; 30 C. J., p. 289, n. 7. (3) 16 C. J., p. 735, n. 45, p. 736, n. 46, p. 737, n. 52, p. 772, n. 27, 31; 30 C. J., p. 289, n. 5.   (4) 30 C. J., p. 289, n. 7.

APPEAL from a judgment of the Superior Court of Butte County and from an order denying a new trial. H. D. Gregory, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. Oscar Goldstein for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

---

2.  See 13 Cal. Jur. 678, 679; 13 R. C. L. 738.
3.  See 8 Cal. Jur. 165, 248.
4.  See 13 Cal. Jur. 677.

PLUMMER, J.—The defendant was charged by the district attorney of Butte County with the crime of murder alleged to have been committed on the third day of August in the county of Butte. The trial resulted in a conviction of manslaughter. The defendant's motion for a new trial having been denied, this appeal is prosecuted from the order denying the defendant's motion and from the judgment of conviction. The points relied upon for a reversal are that the *corpus delicti* was not established either by circumstantial or direct evidence so as to admit of the statements or confession of the defendant and also that the venue of the offense was not sufficiently established. The testimony bearing upon these two points set out in the transcript is as follows: Harold Teeter, a witness called by the People, testified: "I live in Chico. I am eighteen years old. I am the son of Mark Teeter. My father was stabbed on Sunday night, August second, around twelve o'clock, or on Monday morning, August third. It was just about midnight. I knew my father. I saw him after he was dead. I know as a matter of fact that my father is dead. He died in the Enloe Hospital. That is in Butte County, California. I last saw my father at the Enloe Hospital. I went to the Enloe Hospital about ten-thirty Monday morning. The people at the hospital sent for me. I was living with my father. We were living out on Ninth and Laburnum."

Doctor N. T. Enloe, a witness called by the prosecution, testified as follows: "My name is N. T. Enloe and I am a duly licensed and practicing physician and surgeon in this county and have been for twenty-four years. During the early morning of August third I had occasion to treat one Mark Teeter for certain wounds he had received. Mr. Teeter died as a result of those wounds. The nature of the wounds that he died of were small puncture wounds. There were four around the nipple and one in the back about halfway between the spine and the scapula—the shoulder blade, toward the lower point of the blade, and the other one was on the exterior surface of the left arm. As I remember it, there were four around the left nipple, one in the back and one in the arm. The wounds were not self-inflicted. I can tell scientifically. In my opinion the wounds were not caused by an accident. I examined the wounds and treated the man for them. In my opinion the instrument that

caused those wounds would be a small sharp pointed instrument and long.''

On cross-examination the doctor further testified: ''I really do not know when I first saw Mark Teeter on the 3rd of August. It was early in the morning sometime. I do not remember what time. I do not know how many hours that was after he was brought to the hospital. As I remember it, when I examined the wounds, I found four punctures on the left side close to the nipple. As to what I found about those wounds that caused me to say that they could not have been self-inflicted, it would be practically impossible for a man to stand up and jab himself four times in succession, and on the wounds in the back, it would be absolutely impossible for him to get to it. . . . It would be practically impossible for the wounds in front or back to be self-inflicted. I do not know which particular wound caused the death of the man. I don't know if it was the wound on the back that caused the death. It was not the wound in the arm that caused the death. It might have been the wounds on the left chest. The contributing causes of the death of Mark Teeter was the puncture wounds with external hemorrhage. The deceased was intoxicated. As to the question of alcohol having anything to do with his death, his weakened condition made him less able to stand the shock of the puncture wounds. If he had not had the alcohol I don't know whether he would have survived. No one could say whether he would have survived or not. The fact that the man was intoxicated and in a weakened condition made him more susceptible to the injury. I do not know what particular instrument caused these wounds, only a long sharp pointed instrument. In my opinion those wounds which I found were wounds which were caused by a sharp pointed long instrument. I performed an autopsy. The findings in that regard were a puncture in the left lung, and I do not remember which one of them went through it. His heart was on the right side. The heart is usually on the left side. I don't remember how long I treated Mark Teeter in the hospital, but about half a day I should judge. I have no way by which I could tell which one of the wounds was directly responsible for the puncture. As to any way of my determining which of the wounds was responsible for the puncture found in the autopsy, I say I found it at that time but I do not remem-

ber which one it was. As to the drinking being a contribut-
ing cause of his decease, his weakened condition from drink-
ing probably had something to do with it. The wounds were
the immediate cause of the death of Mr. Teeter.''

The testimony shows that after the defendant had made
his statement to the arresting officer, the arresting officer
went to the place indicated by the defendant and there
found the deceased in an automobile, wounded as herein
described; that the deceased was taken to the Enloe hospital,
where he died; also that the officers found a certain ice-pick
in an automobile belonging to the defendant which was a
long pointed instrument.

L. E. Newton, a witness for the prosecution, testified as
follows: ''I am constable of Chico township and deputy
sheriff of this county. I know the defendant Mr. Coker. I
got that ice-pick on or about the early morning of August
3rd of this year; I got it out of Mr. Coker's car, it had
blood stains on it at that time; I saw Mr. Coker on that oc-
casion, that is early on the morning of August 3rd, 1925. I
saw him in the police station in Chico, about 12:30 on the
morning of August 3rd just after midnight. Mr. Coker
and Johnnie Boyle were there. It was at the police station.
The defendant made a statement that he had had a little
trouble out at the house and to get an ambulance and go
out and bring the man in that he had trouble with. He
said he thought he had killed him. He said the man was
Mr. Teeter. Q. Now, what else, if anything, Mr. Newton,
did Mr. Coker tell you at that time? A. There was not very
much more said right at that time because I was in a hurry
to go out to the place where the trouble took place. Q. Now
then afterwards, Mr. Newton, did he say anything further
to you?'' To which question defendant objected that the
*corpus delicti* had not been proven. ''The Court: As far as
the *corpus delicti* is concerned, I have stated in regard to
that but that foundation is too late. As far as the *corpus
delicti* is concerned, if that is not proven, the testimony
will go out. Q. Did he make any other statements to you,
Mr. Newton— A. No, I asked him if he killed him and he
said he did not know but he intended to. Q. That is Coker
said that he intended to kill Teeter. A. Yes, sir. Q. Did
you have any further conversation with him, Mr. Newton, at
a later time? A. Not until the next morning. Q. Did you

know whether or not at that time Mr. Coker was informed of his legal rights, that is, that he did not have to say anything. A. He was. Q. Will you tell us if you can remember anything that he said at that time. A. He said he expected he would stretch hemp for what he had done.''

Johnnie Boyle, a witness called by the People, testified as follows: "I am a police officer of the City of Chico; I was on duty as a police officer about midnight August the second and early in the morning of August the 3rd of this year; I have seen that ice-pick before. I put that tag on there myself, that is my handwriting. I saw Mr. Newton getting it out of Mr. Coker's car which was across the street from the city hall. I know the defendant Mr. Coker, I saw him on the night of August second or early on the morning of August third of this year. No one else was present when I first saw him; it was about 12:30; I was on duty at the desk; the defendant was not under arrest at that time. Q. Did you have any conversation with the defendant Coker about this time, Mr. Boyle. A. Yes, sir. Q. Tell the conversation. Mr. Goldstein: I will object to it further on the ground that the *corpus delicti* has not been raised or established and it is incompetent, immaterial and irrelevant. (Objection overruled.) A. Well, he asked me where the officers were and I said they were all out on duty and he then asked me if there was an unwritten law here and I answered him by saying that I didn't know anything about it, about an unwritten law and he then said 'You better get an ambulance and send him out to Ninth and Laburnum and get a man that is out there if he is not dead' and at that same time he took the knife out of his pocket and laid it up on the counter and said 'This is all I have got' and he said 'Here I am' and I told him that that was outside of the city limits and he would have to get the Constable and so I called Newton up. And in the meantime Tom Hinderman stepped in, he is a police officer of Chico and in a few minutes Officer Newton came and I asked him, Mr. Coker, what the trouble was and he said 'We had a row out there' and he said 'That is the second time this thing has occurred' and he said 'I am not going to stand for it.' And 'that time my family has been broken up and I ain't going to stand for it any more' and I asked him, I said 'Was it a gun fight' and he said 'No, I run an ice-pick into him' and he said 'that he

ought to have got her too.' And he said 'the ice-pick is over in my car across the street,' and I looked across the street out of the window and saw the car parked there and Mr. Newton stepped in in a short time and he wanted to go out with us, Mr. Coker did, and I said 'No, you better stay here with Mr. Hinderman until we come back,' and we got into Mr. Newton's car and drove to Ninth and Laburnum and we turned into the alley. The house was lighted up—and, prior to that— I am ahead of my story: Mr. Coker directed us into the alley. He said the car was just west of the house in the alley and we turned into the alley and the car was not there and we went down the alley sixty or eighty yards and there we found the car jammed up against a shed or barn. And we drove alongside of it and on the west side and Mr. Newton got out of the car and went around behind Mr. Coker's car and opened the door. I got out, and Mr. Teeter was in the car and he was lying with his head to the west and his feet was out of the east door. Mr. Newton went around behind the car and we both put him in Mr. Newton's car and we drove to the hospital with him and there we took him into the hospital. I looked at my watch and it was twenty minutes after one and we left the hospital then and came to the Police Station and parked our car and went over to Mr. Coker's car and Mr. Newton looked in the front seat and he found the ice-pick lying in the front seat there and we took it into the Police Station. Q. It was the same ice-pick—this is the same ice-pick is it Mr. Newton (exhibiting ice-pick to witness)? A. Yes, that is the same pick. Q. And you saw Mr. Newton pick it up? A. Yes, sir. Q. And you put the tag on it? A. Yes, sir, I put the tag on it and I put that knife in the envelope and put it in the safe. Mr. Rothe: We will ask to have this ice-pick introduced in evidence as People's Exhibit 'A.' Mr. Goldstein: To which we will object on the ground that it is incompetent, immaterial and irrelevant and the proper foundation has not been laid and there is not anything to connect this defendant with the ice-pick. The Court: The objection will be overruled. Mr. Rothe: We will ask to have it marked People's Exhibit Number One. (The ice-pick is admitted in evidence and marked People's Exhibit Number One by the Clerk.) Mr. Rothe: Q. All you have testified to, Mr. Boyle, occurred in Butte County, Cali-

fornia, did it? A. Yes, sir. Q. What time was it you say you first got this call or that you first saw Mr. Coker come into the Police Station? A. That was about half-past twelve. I took some notes on it at the time and looked at my watch and it was half-past twelve. Q. And it was then that he told you that, that he—or said that he had used an ice-pick on this man Teeter, is it? A. Yes, sir. Q. That is just a little after midnight that he told you this? A. Yes, sir.''

By the testimony of the witness Boyle is shown not simply the admission or statements of the defendant that he had stabbed the deceased, but that the body or person of the deceased was found in a car in such a condition as to justify the jury in coming to the conclusion that it was physically impossible for the deceased to have driven the car to that place; that the deceased was taken to a hospital in Chico; that the instrument with which the defendant said he had stabbed the deceased was found in the defendant's car, all took place in the county of Butte, not merely, as argued by appellant, that the conversation took place in the county of Butte. In the case of *People* v. *Peete*, 54 Cal. App. 333 [202 Pac. 51], the court, in passing upon the question of venue, uses language pertinent to the questions we are considering.

''It is claimed that there was no proof of venue. It is argued that because the venue depends, not upon where the dead body may be found, but upon the place where the mortal wound was inflicted, it may not be inferred that the deceased was killed in Los Angeles County. The objection lacks merit. The venue, like any other fact in a criminal case, may be established by circumstantial evidence. And though no witness testified that Denton was murdered in Los Angeles County, the conviction being based entirely on circumstantial evidence, it is uncontradicted that the body was found in the city of Los Angeles, in the basement of the house that Denton had leased to defendant, many miles from the county line, covered with a mound of dirt, canvas, and other articles, showing that the body had been placed there by someone. This evidence, unexplained, was sufficient to justify the jury in concluding that the homicide was committed in Los Angeles County. In *Hawkins* v. *State*, 60 Neb. 380 [83 N. W. 198], it was held that

'evidence of the finding of the headless body of the person alleged to have been murdered in an old well which had been subsequently filled, situate in Frontier County, is sufficient, in the absence of other proof, to warrant the jury in concluding that the homicide was committed in that county.' To the same effect is *People* v. *Kamaunu*, 110 Cal. 609 [42 Pac. 1090]. See, also, Wharton on Homicide, pp. 901, 902.''

[1] In the instant case the body of a man mortally wounded is found in an automobile, under circumstances which impel the conclusion that the car was not driven by the deceased after the infliction of the mortal wounds, the taking of deceased to a hospital, where an examination disclosed that the deceased had upon his person wounds which could not have been self-inflicted; that the character of the wounds indicated that a long sharp instrument had been used and that an instrument with which a like wound could be inflicted was found in the defendant's car with blood upon it, all in the county of Butte, we think sufficiently established the venue of the offense and justified the jury in coming to the conclusion that he had been killed in the county of Butte.

[2] It is also argued by the appellant that the court erred in admitting the ice-pick in evidence, and cites the case of *People* v. *Hill*, 123 Cal. 571 [56 Pac. 443], as authority for this contention. An examination of the Hill case shows that there is no evidence identifying the stick which was admitted in evidence as the one with which the defendant in that case struck the deceased. In the case at bar the homicide is fully established by the testimony of Dr. Enloe that the deceased was mortally wounded by a long sharp instrument. It is also shown by the doctor's testimony that the wounds were of such a nature as to be practically impossible of self-infliction; that the deceased came to his death by reason of such wounds. Again, the ice-pick is admissible in connection with the defendant's statement as to where it would be found and as to how he had used it. It is corroborative of the defendant's statement, but is not a necessary part of the testimony to establish the *corpus delicti*. As shown by the cases cited in this opinion the finding of the body of a person either dead or mortally wounded by wounds that he could not have self-inflicted and his following death establishes the *corpus delicti* and the

fact that a homicide has been committed, which in turn, under the authorities, admits the statement of the defendant, when there are no other objections to its admissibility, and this, in turn, admits the ice-pick as a means or instrumentality by which the offense was committed.

[3] In 8 Cal. Jur., page 165, in giving a definition of the term *"corpus delicti,"* we find the further statement that "proof of the *corpus delicti* does not involve proof that the crime was committed by the defendant or the person charged with committing it. Consequently, mere proof of the defendant's connection with the crime is not sufficient, on the one hand, to establish the *corpus delicti,* and, on the other, it is not necessary in order to establish the essential elements of the crime to prove the defendant's connection with it. Yet, proof of the criminal agency frequently involves proof of the defendant's guilt." In section 248, same volume, the rule is stated that the *corpus delicti* may be established by direct or circumstantial evidence though it cannot be established by the extrajudicial confessions of the defendant.

"The *corpus delicti* may be established by direct or circumstantial evidence. But it cannot be established by the extrajudicial admissions or confessions of the defendant, or, as the rule is frequently expressed, a conviction cannot be had on the extrajudicial admissions or confessions of the defendant unless corroborated by proof aliunde of the *corpus delicti*. While slight proof of the *corpus delicti* has in many cases been held to be a sufficient basis for the admission of confessions, it is nevertheless true that all the elements of the crime must be made to appear before a defendant's extrajudicial admissions or confessions are admissible for any purpose, and they cannot be used to establish any necessary element for the commission of the crime. Yet, it is not required that full proof of the body of the crime be made independently of the confession, that is to say, that the evidence, other than the admissions and declarations of the defendant, establish the commission of the offense beyond a reasonable doubt. The admission or confession is admissible in support of any element of the crime to which it applies, otherwise it would be useless except to prove the agency of the accused."

In this particular, the appellant relies upon the case of *People* v. *Tapia,* 131 Cal. 647 [63 Pac. 1001], where the defendant was convicted of murder and the body of the deceased more or less consumed by fire. The court said: "A great deal of his body (the deceased) had been entirely consumed by the fire; still, we think, it was sufficiently identified as the body of the deceased. But the evidence of the other facts necessary to make full proof of the *corpus delicti*—that is, that his death was caused by criminal means used by another person and not by his own act or by accident—was very slight. We hardly think that any jury would have found that a murder had been committed without certain evidence tending somewhat to connect appellant with the crime charged, and particularly without the testimony of another Indian, named Francisco (who was comparatively a stranger to appellant), to the effect that appellant had made a confession to him that he (appellant) killed the deceased."

This excerpt shows that the circumstances in that case are readily distinguishable from those of the case at bar. Here we have all the elements necessary to show the fact of a homicide, irrespective of any statement of the defendant. In the Tapia case, the building in which the deceased's body was found by the neighbor was destroyed by fire without evidence as to the origin of the fire. In the case at bar, the testimony is that the deceased was mortally wounded in a manner which was practically impossible to have been self-inflicted and completely meets the further statement of the rule found in the Tapia case, where it is said: "It is well settled law that the *corpus delicti* must be established independently of evidence which merely tends to connect the defendant with the crime charged; and independently of any asserted extrajudicial admissions or confessions of the party charged, and that such admissions or confessions cannot be considered as evidence of the *corpus delicti*. In *People* v. *Simonson,* 107 Cal. 345 [40 Pac. 440], this court declared the rule as follows: 'The term *"corpus delicti"* involves the elements of crime,' and that 'defendant's admissions cannot be used to establish any necessary element in the commission of the crime,' " citing a number of cases.

[4] The testimony further shows all the elements, as we have said. of the crime, to wit, the commission of a homi-

cide without any reference whatever to the admissions or statements or confessions of the defendant. We also think the case of *People* v. *Frank*, 2 Cal. App. 283 [83 Pac. 578], relied upon by appellant, is inapplicable to the case at bar. The definition of the term *"corpus delicti"* there given is substantially as we have herein set forth. The finding of a dead body alone does not establish, as held in that case, the *corpus delicti*, but as held in that case, it must be shown that death is the result of criminal agency, which conditions are fully and completely met in the case at bar. See, also, *People* v. *Flores*, 34 Cal. App. 393 [167 Pac. 113]; *People* v. *Britt*, 62 Cal. App. 674 [217 Pac. 767].

Under the New York Code of Criminal Procedure providing that the confession of a defendant shall not be sufficient without additional proof that the crime charged has been committed, the finding of the dead body of a murdered man, with the unmistakable marks of a murder committed, is sufficient additional proof to warrant the conviction of a defendant on his own confession. (Kerr on Homicide, sec. 494; 3 Rice on Criminal Evidence, sec. 293; *People* v. *Deacons*, 109 N. Y. 374 [16 N. E. 676].)

Other cases might be cited upon the question of the sufficiency of the proof in this case to establish the *corpus delicti* and also show the sufficiency of the proof as to venue, but we think the foregoing sufficient to show that the defendant was justly convicted. The order and judgment appealed from are affirmed.

Hart, J., and Finch, P. J., concurred.