[Crim. No. 5852. In Bank. Oct. 5, 1956.]

THE PEOPLE, Respondent, v. CHARLES E. COLE,
Appellant.

William E. Jensen and Kenneth K. Casper for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and F. G. Girard, Deputy Attorneys General, for Respondent.

GIBSON, C. J.—A jury found defendant guilty of first degree murder and fixed his punishment at life imprisonment. The principal questions raised on this appeal are whether the trial court erred in ruling upon the admissibility of evidence and whether the evidence is sufficient to support the verdict.

The body of the victim, Mrs. Helen Roberts, was found near a road in Sutter County on the afternoon of November 15, 1954. Dr. Paxton, a pathologist, examined the body and performed an autopsy. He testified that Mrs. Roberts was an obese woman about 50 years of age, that her death was caused by a gunshot wound, and that the fatal bullet, which he removed from the body, had entered below the left armpit and had traveled across the thorax, with a slight deviation backward and upward, penetrating the heart, right lung, and soft tissue beneath the right shoulder and striking the humerus of the right arm three inches below the shoulder joint.

Defendant did not testify at the trial, and there is no substantial conflict in the evidence. In August of 1954 Mrs. Roberts abandoned her husband and began living with defendant in various motels under fictitious names. Late in the afternoon of November 14, defendant and Mrs. Roberts drove away in a station wagon from a Vallejo motel where they were then staying. About 6:30 p.m. they stopped in front of a grocery store which Mrs. Roberts entered. Later defendant got out of the car, and a young man named Shelton made a remark about the damp weather. Defendant drew an automatic pistol from his belt, pointed it at the sky, asked whether he should do something about the weather, replaced the gun under his coat and went into the store. Shelton testified that the gun looked like the weapon identified at the trial as the one which fired the shot killing Mrs. Roberts. When defendant and Mrs. Roberts left the store, they drove across the street to a service station, where, before leaving together, they talked to the attendant for approximately 20

minutes. In the course of this conversation, Mrs. Roberts was in good spirits, and defendant was solemn.

For several months prior to November 14, defendant intermittently occupied a room which he rented in Vallejo at the home of a Mrs. Hill, an elderly widow who had agreed to marry him. Early in the afternoon of that day, he came to visit Mrs. Hill and left after about two hours. He returned at 9 p.m., and, when Mrs. Hill opened the door, he exclaimed, "Helen shot herself, Helen shot herself." He told Mrs. Hill that Mrs. Roberts, while in the station wagon, took a gun out of the glove compartment, said, "I ought to shoot you and the dog and myself," pointed the gun at herself and fired the fatal shot.

Mrs. Hill and defendant went out to the station wagon in front of the house, and the body of Mrs. Roberts, which was still warm, was on the front seat. They drove to a point in Sutter County, where defendant left the body in high grass beside the road. Upon returning to Vallejo, they went to the motel where defendant and Mrs. Roberts had been staying. Defendant awakened the motel owner in order to obtain a key, stating that "mama" had gone to the movies with another man and that, if she came back and wanted to reach defendant, he would be at Mrs. Hill's residence. After collecting his belongings, he drove with Mrs. Hill to her home.

Defendant cautioned Mrs. Hill not to reveal their activities of that evening and instructed her to say that he had left Mrs. Roberts at a theater, arranging to return for her at 9 p.m., but that, when he and Mrs. Hill went to the theater at that hour, Mrs. Roberts entered a car with another man and drove away. He gave Mrs. Hill a gun, requesting that she dispose of it, and she wrapped it up and asked one of her boarders to drop it in the bay. The boarder became suspicious and turned the gun over to the police. When questioned by the authorities, defendant stated that he and Mrs. Roberts left their motel in Vallejo on the afternoon of November 14, that, after stopping at a grocery store, he took her to a theater and that, when he returned for her, he saw her drive away with another man.

The gun which defendant gave Mrs. Hill after the death of Mrs. Roberts was introduced in evidence and was identified by a ballistics expert as the one which fired the bullet removed from Mrs. Roberts' body. Mrs. Hill testified that the gun looked like one which belonged to her. She said that about six weeks before the death of Mrs. Roberts she had given

her gun to defendant to be cleaned and that he returned it in about a week. She placed it on the dresser in her bedroom, and later she noticed that it had disappeared. She could not say on what day she first became aware that it was missing but stated that it disappeared sometime during the week preceding Mrs. Roberts' death.

The first question is whether the trial court erred in ruling on the admissibility of evidence. Upon being called as a witness, Dr. Paxton, who performed the autopsy, testified that he specialized in pathology and autopsy work to determine causes of death. Defendant stipulated to the qualifications of the witness. When the doctor was asked whether, in his opinion, the wound could have been self-inflicted, defendant objected on the grounds that no foundation had been laid as to the qualifications of the witness to form such an opinion and that the matter was not a proper subject for expert testimony. The objection was overruled, and the doctor testified that ''This would be a very unusual pattern for a self-inflicted wound.'' In elaborating, he referred to the location of the wound, the course of the bullet and the obesity of the victim, and he stated that it would be difficult for a person, whether right-handed or left-handed, to hold the muzzle of a gun against himself in the position necessary to produce such a wound. He testified that his opinion was based on his training and experience, as well as the condition of the body, that he had examined suicide victims who had died of gunshot wounds and that he had never seen a self-inflicted wound ''in this position.''

Many cases have set forth the general principles to be applied in considering the admissibility of expert opinion on the question whether a wound was self-inflicted. ▮ Although courts have not always used the same language, the decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (See *George* v. *Bekins Van & Storage Co.*, 33 Cal.2d 834, 844 [205 P.2d 1037]; *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 570-571 [147 P. 238]; *Howland* v. *Oakland C. St. Ry. Co.*, 110 Cal. 513, 522 [42 P. 983]; *Wells Truckways, Ltd.* v. *Cebrian*, 122 Cal.

App.2d 666, 677-678 [265 P.2d 557] ; *Eger* v. *May Department Stores*, 120 Cal.App.2d 554, 558 [261 P.2d 281] ; *Manney* v. *Housing Authority*, 79 Cal.App.2d 453, 460 [180 P.2d 69] ; Code Civ. Proc., § 1870, subd. 9;* 7 Wigmore on Evidence (3d ed. 1940), § 1923, pp. 21, 22.)

In two California cases a doctor's opinion that a fatal wound could not have been self-inflicted was relied upon in holding that there was sufficient evidence to establish the corpus delicti. (*People* v. *Black*, 103 Cal.App.2d 69, 75 [229 P.2d 61] ; *People* v. *Coker*, 78 Cal.App. 151, 161 [248 P. 542].) In a number of other jurisdictions it has been held that medical opinion as to whether a wound could have been self-inflicted was admissible. (*State* v. *Lee*, 65 Conn. 265 [30 A. 1110, 1113-1114, 48 Am.St.Rep. 202, 27 L.R.A. 498] ; *Everett* v. *State*, 62 Ga. 65, 71; *State* v. *Schneck*, 85 Kan. 334 [116 P. 823, 824] ; *State* v. *Sharp*, 145 La. 891 [83 So. 181, 182] ; *State* v. *Knight*, 43 Me. 11, 131; *Commonwealth* v. *Spiropoulos*, 208 Mass. 71 [94 N.E. 451, 452] ; *Miera* v. *Territory*, 13 N.M. 192 [81 P. 586, 588-589] ; *People* v. *Wilson*, 109 N.Y. 345 [16 N.E. 540, 543] ; *Commonwealth* v. *Puglise*, 276 Pa. 235 [120 A. 401, 402].) The reasoning underlying these decisions is that the subject of self-inflicted wounds is not one of such common experience that laymen may not be assisted by the opinion of a doctor, who has special knowledge regarding anatomy and injuries to the human body.

We are aware that cases in some jurisdictions have held that testimony of this type is not admissible. (*Treat* v. *Merchants' Life Assn.*, 198 Ill. 431 [64 N.E. 992, 994] ; *Knights Templars' & Masons' Life Indem. Co.* v. *Crayton*, 110 Ill. App. 648, 662-663; *Aetna Life Ins. Co.* v. *Kaiser*, 115 Ky. 539 [74 S.W. 203, 205] [overruled on other grounds in *Inter-Southern Life Ins. Co.* v. *Hinkle's Admx.*, 226 Ky. 724 [11 S.W.2d 913, 914]] ; *State* v. *Carr*, 196 N.C. 129 [144 S.E. 698, 699-700] ; *State* v. *Gibson*, 69 N.D. 70 [284 N.W. 209, 217-218] ; *State* v. *Bradley*, 34 S.C. 136 [13 S.E. 315, 316-317] ; *State* v. *McCravy*, 133 Tenn. 358 [181 S.W. 165, 168] ; *Maynard* v. *State*, 154 Tex.Crim. 521 [229 S.W.2d 65, 67] ; *Metropolitan Life Ins. Co.* v. *Wagner*, 50 Tex.Civ.App. 233

---

*Section 1870 of the Code of Civil Procedure provides:

"In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: . . .

"9. The opinion of a witness respecting the identity or handwriting of a person, when he has knowledge of the person or handwriting; his opinion on a question of science, art, or trade, when he is skilled therein; . . ."

[109 S.W. 1120, 1123-1124] ; see *People* v. *Curtright,* 258 Ill. 430 [101 N.E. 551, 554].) In our opinion, however, they do not represent the better view with respect to whether the trier of fact would ordinarily be in a position to determine, as intelligently as a doctor, whether a wound was self-inflicted. Moreover, some of these cases rest, at least in part, upon the ground that the opinion of the doctor would go to an ultimate issue of fact to be resolved by the jury, whereas in this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact. (*People* v. *Wilson,* 25 Cal.2d 341, 349 [153 P.2d 720] ; *People* v. *King,* 104 Cal.App.2d 298, 304 [231 P.2d 156] ; see *People* v. *Martinez,* 38 Cal.2d 556, 564 [241 P.2d 224] ; *Wells Truckways, Ltd.* v. *Cebrian,* 122 Cal.App.2d 666, 678 [265 P.2d 557] ; 7 Wigmore on Evidence (3d ed. 1940), §§ 1920, 1921, pp. 17, 18; 2 Morgan, Basic Problems of Evidence, p. 194 et seq.; 2 Wharton, Criminal Evidence (11th ed.), § 957, p. 1682.)

A conclusion that the testimony complained of was inadmissible would amount to a holding that the jurors, although laymen whose experience with gunshot wounds and suicide was likely to be limited or nonexistent, could not have derived assistance from the opinion of a doctor who was an expert on those matters and had personally examined the body and performed the autopsy as a specialist on causes of death. Where expert opinion evidence is offered, much must be left to the discretion of the trial court (*People* v. *Haeussler,* 41 Cal.2d 252, 260 [260 P.2d 8]), and we are satisfied that there was no abuse of discretion in permitting Dr. Paxton to express his opinion. The jurors, of course, were not bound by the opinion of the witness but were free to determine the weight to which it was entitled and to disregard it if they found it to be unreasonable, and they were so instructed. (Pen. Code, § 1127b*.)

The early cases of *People* v. *Farley* (1899), 124 Cal. 594, 595 [57 P. 571], *People* v. *Milner* (1898), 122 Cal. 171, 181

---

*Section 1127b of the Penal Code reads:

"When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows:

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the

[54 P. 833], *People* v. *Smith* (1892), 93 Cal. 445, 447 [29 P. 64], and *People* v. *Westlake* (1882), 62 Cal. 303, 309, are readily distinguishable. They did not involve the question of suicide but held that a doctor may not give an opinion, based on the course of a bullet, as to the posture of a person shot by another or as to the relative positions of the victim and the one who fired the shot. As pointed out in the Milner case, it is impossible to determine those matters from the course of the bullet alone, since a number of variables might be involved, such as whether the victim was leaning forward or standing erect. (See also *People* v. *Salaz,* 66 Cal.App. 173, 183 [225 P. 777].)

The next question is whether the evidence is sufficient to support the verdict of first degree murder. Section 187 of the Penal Code defines murder as the unlawful killing of a human being with malice aforethought, and section 189 of that code provides, in part, that all murder perpetrated by any kind of willful, deliberate and premeditated killing is murder of the first degree.

■ The record clearly warrants a conclusion that defendant killed Mrs. Roberts, and there is nothing showing provocation or justification for the homicide. Under such circumstances, malice will be implied. (Pen. Code, § 188.)

■ Deliberation and premeditation may be inferred from proof of circumstances which will furnish a reasonable foundation for such an inference, and, where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination. (*People* v. *Gulbrandsen,* 35 Cal.2d 514, 519-520 [218 P.2d 977].) ■ There was evidence that defendant had secretly taken Mrs. Hill's gun from her dresser during the week preceding Mrs. Roberts' death, that he was carrying the weapon on his person about 6:30 p.m. on the evening she died and that he used it to kill Mrs. Roberts sometime before 9 p.m. The jury could infer that defendant had taken the gun for the purpose of killing her.

■ Moreover, the evidence was sufficient to show that defendant planned to implicate Mrs. Hill so as to secure her assistance in concealing his guilt and that he had formed

opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable.

"No further instruction on the subject of opinion evidence need be given."

this plan before committing the crime. It was established not only that he took her gun and used it in the killing but also that he brought the body to Mrs. Hill's home, represented that Mrs. Roberts had shot herself and asked Mrs. Hill to accompany him on the trip to Sutter County where he left the body in high grass beside the road. Defendant also requested Mrs. Hill to dispose of the gun used in the killing and instructed her not to disclose their activities but to give such an account of events as would substantiate his subsequent claim that he had last seen Mrs. Roberts driving away from a theater with another man. Mrs. Roberts had been seen alive two hours before defendant brought her body, which was still warm, to Mrs. Hill's home. The taking of Mrs. Hill's gun during the preceding week and the speed with which defendant acted following the killing would support the conclusion that his plan to involve Mrs. Hill had been conceived before the crime was committed.

There was also evidence that, while defendant was living with Mrs. Roberts, who was in financial distress, he planned to marry Mrs. Hill, who had a substantial bank account and owned a home and other property. During the period that defendant was living with Mrs. Roberts he borrowed money from Mrs. Hill, and on the day of the killing he represented to the owner of the motel where he was staying that property belonging to Mrs. Hill was owned by him and expressed a desire to ascertain the feasibility of locating a service station on it. The jury might have determined that defendant had become dissatisfied with the relationship existing between him and Mrs. Roberts and that he planned to kill her in order to remove her as an obstacle to his plan of obtaining Mrs. Hill's property through marriage. A showing of motive indicating that the killing was planned is evidence tending to support a finding of deliberation and premeditation. For example, in *People* v. *Gulbrandsen, supra,* 35 Cal. 2d 514, where we held that deliberation and premeditation were sufficiently shown, we relied, in part, on evidence that the defendant's motive in killing the two victims was to get them out of the way so that he could force himself upon a woman. (See also *People* v. *Werner,* 111 Cal.App.2d 264, 272 [244 P.2d 476].)

The evidence is sufficient to support the jury's finding that defendant was possessed of a willful, deliberate and premeditated intent to kill.

■ There is no merit in defendant's contention that the court erred in refusing to instruct the jury that Mrs. Hill was an accomplice as a matter of law. The question of complicity was one of fact, and its determination was left to the jury under instructions which fully and correctly set forth the rules of law to be applied.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

SCHAUER, J., Concurring and Dissenting.—I agree that there was ample properly admitted evidence to support the finding that defendant murdered Mrs. Roberts wilfully, deliberately, and with premeditated intent to kill, and I find no miscarriage of justice. However, I disagree with the holding that in the circumstances of this case Dr. Paxton was properly allowed to testify, in answer to the question, "assuming that the bullet you took from the body . . . had come from a .32 caliber Colt automatic pistol, do you have an opinion as to whether or not that pistol could have been held by the deceased at the time the trigger was pulled and the gun was discharged?" that "I have an opinion . . . This would be a very unusual pattern for a self-inflicted wound." It seems obvious to me that the pertinent question here is not whether it was usual or unusual for persons who kill themselves to do so by shooting themselves in the manner in which deceased was shot, but whether this particular woman inflicted this particular wound upon herself. It appears to me that the doctor's testimony as to the frequencies of occurrences of this kind of wound and of other kinds of wounds among other persons committing suicide is irrelevant to any issue here.

The doctor (whose qualifications as a *pathologist* are not disputed) described the course taken by the bullet, indicated it on a photograph of deceased and sketched it on a blackboard. The bullet entered the body "anteriorally and laterally in the left chest" between the third and fourth ribs, traveled up through the heart and upper lobe of the right lung, and struck and shattered the humerus of the right arm about three inches below the shoulder joint.

Before the jury the prosecuting attorney asked, in various forms, if the doctor had an opinion as to whether the wound could have been self-inflicted. This might have been a proper

approach if a sufficient factual foundation had been laid; but such foundation had not been established, and, as subsequently appeared, did not exist. Defense counsel objected, and said, ''I feel this is going into a matter that is for the jury to decide, and not called upon for any expert witness' testimony. I don't believe there has been *any foundation or ground* showing this doctor is an expert, whether a wound can be self-inflicted or whether inflicted by some other agency.'' (Italics added.) This objection raised, although not in a particularly apt manner, the question whether a sufficient *factual foundation* had been laid upon which this doctor or any doctor could be qualified to give an opinion that this woman could or could not have shot herself in the fashion in which she was shot. The prosecuting attorney said, ''We feel the doctor is qualified, having seen this body; he has noticed the length of the arms of the deceased person and . . . has already testified to her obesity and so forth and so on; we feel he is in a position to tell us whether he thinks that person could have discharged a pistol into her own person as to cause this wound.'' But as hereinafter shown the doctor himself established the facts showing want of foundation for formation of an opinion entitled to be received as ''expert opinion'' on the pertinent issue.

There was further argument on the question outside the presence of the jury, during which defense counsel correctly pointed out that ''as far as the testimony as to the length of the arm, or anything like that, those facts are not yet in evidence.'' The trial court commented, ''if the question of death of this woman depends solely . . . [on] the expert or opinion testimony of Dr. Paxton, they would be on very weak ground. However, I am making no ruling on that at this time. I am now overruling the objection, however. . . . The value will go to the jury, its weight. You of course will have full opportunity to cross-examine Dr. Paxton in that respect.'' This ruling, in my opinion, was error because the prosecution had not adduced evidence upon which the doctor could be qualified to either form or express an opinion that the wound in this case could or could not have been self-inflicted.

Before the jury the doctor then testified on direct examination that ''This would be a very unusual pattern for a self-inflicted wound''; that he did not know whether deceased was right-handed or left-handed, but that (indicating upon himself with the pistol which inflicted the wound) it would be

difficult to inflict such a wound upon himself with either hand. It appears to me that in the absence of showing some similarity or defined dissimilarity between the doctor's and the decedent's pertinent capabilities, the doctor's testimony concerning himself would be immaterial. On cross-examination the doctor testified that *he had not measured the deceased's arms.* The basis of the doctor's opinion that the wound was not self-inflicted was then brought out: he had examined by autopsy "perhaps twenty people" who died from gunshot wounds and seen "numerable cases in the emergency hospitals which I have worked in"; "I can form an opinion from my past experiences in examining the suicidal victims . . . and I would say that ninety percent of the suicidal victims I have examined have shot themselves in the head . . . And a majority of those are in the right temple . . . The next most common site is through the mouth . . . The next most common site is an attempt at the heart . . . and I have never seen one in this position. . . . The location in my opinion indicates that this is not self-inflicted."

The basis of the doctor's opinion as expressed in his testimony shows that there was not adequate factual foundation for, and that he was not qualified to express, the opinion above quoted. It was of no concern to the jury, and not helpful to them, to know that "ninety percent of the suicidal victims" examined by Dr. Paxton had "shot themselves in the head" rather than shot themselves in certain other places or, it may be interpolated, had jumped off bridges or hit themselves over the head with axes. The case here concerned the woman who did die from the wound in the chest described above. The question for the jury was whether that particular wound was inflicted by decedent or by another person. Since the prosecution had not, before the doctor gave his opinion, shown a factual base upon which the doctor as a pathologist could intelligently and reasonably form and support the opinion that the wound here involved was not self-inflicted,[1] that opinion should not have been received in evidence. The error of receiving it became more apparent when on his cross-examination it developed that he had no basis for an opinion that this particular woman *could not* have shot herself as she was shot. However, as stated above, it does not appear to me,

---

[1] The evidence contains no suggestion that the doctor was acquainted with the decedent in her lifetime and knew her character as evidencing a propensity to commit an act such as suicide in a conventional rather than unusual manner.

from an examination of the entire record, that the error resulted in a miscarriage of justice.

Accordingly I concur in the judgment and, generally, in the other propositions of law discussed in the opinion of the Chief Justice.

CARTER, J., Concurring and Dissenting.—In view of the record before us in this case, I am of the opinion that it was error to permit Dr. Paxton to express an opinion that the wound inflicted upon the victim of the homicide "would be a very unusual pattern for a self-inflicted wound." I think it is clear that, even conceding that the subject matter of the inquiry might be within the realm of expert testimony, sufficient foundation was not laid for the opinion of an expert on this subject. Ordinarily, expert testimony is based upon a full and fair statement of all of the pertinent facts relating to the problem on which the expert is called upon to give his opinion. Here, vital and material facts were omitted from the statement and were not within the knowledge of the expert. These facts relate to the length of the victim's arms and the character and quality of the clothing, if any, worn by the victim at the time the shot was fired.

A basic objection to expert opinion evidence in a case such as this is, that the expert is called upon to answer the exact question which is to be determined by the trier of fact, and therefore invades its province. Obviously, if the wound here was self-inflicted, the defendant did not fire the shot, and would therefore not be guilty of the offense charged. If the wound were not self-inflicted, its infliction could be traced directly to defendant.

In my opinion the proper procedure in a case such as this would be for the prosecution to develop all of the facts with respect to the location of the point of entry of the bullet, its course through the body of the victim and the probable distance from the body of the muzzle of the gun at the time it was discharged together with physical facts relative to the size of the victim, clothing worn, length of her arms and ability to move her muscles, and leave the question as to who inflicted the wound for the determination of the trier of fact. It seems to me that upon the presentation of such a factual situation, anyone familiar with the use of firearms is as capable of arriving at an opinion as to whether or not the wound was self-inflicted as a so-called expert in this field.

Notwithstanding my opinion that it was error to admit the testimony of Dr. Paxton on this subject, I am satisfied, after a review of the record, that defendant suffered no infringement of any of his substantial rights, and was not prejudiced thereby, and that such error has not resulted in a miscarriage of justice. It is therefore my duty, by virtue of the provisions of section 4½ of article VI of the Constitution of California, to concur in the affirmance of the judgment, and that is my conclusion.

Appellant's petition for a rehearing was denied October 31, 1956.